Filed 10/22/21  In re G.Y. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| In re G.Y., a Person Coming Under the Juvenile Court Law. | C092972, C093380 |
| NEVADA COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.E.,<br><br>Defendant and Appellant. | (Super. Ct. No. J-09554) |

C.E., mother of the minor (mother), appeals from orders of the juvenile court denying her petition to modify a prior order and terminating her parental rights, freeing the minor for adoption.  (Welf. & Inst. Code, §§ 366.26, 388, 395.)[1]  Mother contends the

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

1

court erred when it denied her an evidentiary hearing on her section 388 petition, found the Indian Child Welfare Act (the ICWA) (25 U.S.C. § 1901 et seq.) did not apply, found the beneficial parental relationship exception to adoption did not apply, and terminated her parental rights. The Nevada County Department of Social Services (Department) concedes the ICWA issue but argues the remaining claims lack merit. We will reverse and remand for limited ICWA proceedings and otherwise affirm the juvenile court's orders.

BACKGROUND

The minor and his parents became familiar to the Department over the course of nearly a year as a result of numerous child welfare referrals beginning in April 2018, just 10 days after the minor's birth. The referrals alleged neglect of the minor by mother and J.Y. (father), both of whom had untreated mental health issues and were incapable of caring for the minor. In addition to allegations of poor home conditions, the minor was not meeting his developmental milestones due to mother's failure to feed him, pick up on his cues for hunger, connect with him, care for him properly, or be consistent with medical appointments. Mother, who reported having been diagnosed with autism, depression, anxiety, attention deficit hyperactivity disorder, attention deficit disorder, and epilepsy, was offered voluntary services on numerous occasions to help her meet the minor's needs. She declined to engage in services.

On March 4, 2019, the Department filed a dependency petition pursuant to section 300, subdivision (b) based on the parents' inability to provide appropriate care due to their mental health issues. The minor was thereafter removed from the parents pursuant to a protective custody warrant. The court ordered the minor detained and subsequently sustained the petition as amended.

Mother was interviewed and stated she used alcohol and marijuana but abstained from marijuana when she was pregnant with the minor. She began taking psychotropic medications at a very young age. She stopped taking them when she was 17 because she

2

felt they were no longer necessary and she did not like the side effects of the medication. She was under the care of a psychiatrist and taking medication to treat her seizures, but was not taking any additional medications. Mother reported no domestic violence in a relationship with father, but that she had experienced domestic violence in her previous relationship. She stated the minor was under the care of a physician prior to removal. She claimed the minor had attended all of his doctor's visits since birth, about one every two months, and received all of his immunizations. She also reported she had been in a relationship with father for approximately four years until they broke up a few months prior.

Father reported having used marijuana and methamphetamine in the past, but claimed he stopped using methamphetamine when he learned mother was pregnant. He denied any current drug use. Father also reported having been diagnosed with depression and anxiety. He took prescribed medication for a few years but then stopped due to the stigma of taking psychiatric medicine and because he feared he would develop a tolerance to the medication.

Both parents were participating in supervised visitation twice a week without incident. However, the parents required a significant amount of redirection, for instance, they had to be reminded to stay off their phones and interact with the minor.

The Department referred the parents to individual counseling, parenting education, and ongoing visitation, and father was referred to substance abuse treatment, drug testing, and community-based support groups. It was noted that while the parents had maintained their desire for reunification, they had been slow to engage in services and had demonstrated limited ability to appropriately do so. The Department recommended the minor remain in out-of-home placement while the parents participated in services.

At the continued disposition hearing, the court found the parents' progress toward alleviating or mitigating the causes necessitating the minor's removal was insufficient. The court ordered that the minor continue in out-of-home placement and the Department

3

provide reunification services to the parents. In September 2019, as agreed by the parties, mother's services were tailored to her specific needs pursuant to recommendations following a psychological evaluation.

As of January 2020, mother had made minimal progress in her case plan services. She was inconsistent in her attendance at appointments with service providers and continued to struggle with meeting her basic daily needs. She lacked follow-through with, and participation in, housing, employment, and social services meetings, and failed to engage with her mental health specialist.

The parents were attending couples therapy until mother was arrested in late 2019 after a domestic violence incident between them. Thereafter, mother attended individual therapy and was reportedly engaged and open. However, she was making minimal progress in her psychiatric services.

Mother was also inconsistent in attending visits with the minor, was acting inappropriately in front of the minor during visits, and did not engage with the minor unless specifically directed to do so. She talked about the case in front of the minor, including making disparaging remarks about the foster parents and the social workers. On one occasion, she brought her dog to a visit, during which the minor suffered from flea bites. She also called the minor an "asshole" when he urinated on her during a diaper change. Of the 48 visits scheduled, mother missed or cancelled eight visits and left four visits early. Despite mother's issues with her case plan, the Department recommended another six months of services.

On February 4, 2020, the parents engaged in another domestic violence incident which led to father's arrest. Mother was hit multiple times but refused an emergency protective order and allowed father to stay with her at a hotel. Later that month, mother reported she was pregnant with father's child.

On February 6, 2020, after finding the parents made minimal progress in their case plans, the court acknowledged the parties' stipulated agreement to (1) hold a combined

4

six-month and 12-month review hearing in March 2020; (2) provide the parents with reunification services until the 18-month review, with the understanding that if the parents failed to comply with their case plans, the Department could file a section 388 petition to terminate services with no objection from the parents; (3) meet and confer regarding the Department's option to file a petition to terminate services in the event of another domestic violence incident between the parents; and (4) meet and design additional services for the parents with input from the service providers.

The March 2020 status review report stated mother was making minimal progress in her services but her participation in individual counseling was adequate. Mother was consistently visiting the minor and was continuing to show improvement in her interactions with him. At the combined six- and 12-month review hearing the following month, the court found mother had made adequate progress in her case plan and ordered continued reunification services, as outlined in the parties' earlier stipulation.

On July 9, 2020, the Department filed a section 388 petition requesting that the court terminate the parents' reunification services pursuant to the terms of the parties' February 6, 2020 stipulation based on additional domestic abuse incidents between the parents on March 23, 2020, April 17, 2020, and July 7, 2020.

As agreed in the stipulation, the parents did not oppose the Department's section 388 petition at the July 16, 2020 hearing. The court granted the petition, terminated the parents' services accordingly, and set the matter for a section 366.26 hearing.

At mother's request, the parties convened at a hearing on July 30, 2020, to clarify their respective understandings regarding the stipulated termination of mother's services. The court ordered that mother be allowed to continue participating in speech therapy with the minor every other week, parent coaching sessions (to be counted as visitations) every other week, and supervised visitation once a week, and that mother be referred to the Consortium for Children and Families.

*Mother's October 14, 2020 section 388 petition*

On October 14, 2020, mother filed a section 388 petition seeking to change the court's July 16, 2020 order terminating her reunification services by ordering that the minor be returned to mother or that reunification services resume, along with unsupervised and overnight visitation. The petition alleged mother completed parenting education classes, the minor graduated from speech and physical therapy in which mother also participated, and mother had made significant progress in her own therapy, including domestic violence counseling. Mother alleged that she was granted a domestic violence restraining order (DVRO) against father on July 29, 2020, and, since then, had severed all ties with father, blocked his calls, and called law enforcement when necessary to enforce the DVRO. She worked continuously with her domestic violence therapist even after her services were terminated. She attended all visits but two (once when the caregivers were evacuated due to fire and once when the caregivers were on vacation). She enrolled in new programs to help develop her skills, and she baby-proofed her home. She was able to purchase a car and pay for services that were not otherwise covered following termination of her services. She also established a support system.

The petition alleged the requested change was in the minor's best interest because he had lived with mother for the first 10 months of his life, he knew her and referred to her as "mama," he sought mother out for comfort, he had a strong and loving bond with mother, he had a new baby brother, and mother had insight into what it was like to grow up with special needs.

The court ordered a hearing on mother's petition to determine whether to grant or deny an evidentiary hearing.

*Section 366.26 report*

The October 2020 section 366.26 report stated that while mother was participating in visits with the minor and taking feedback from the social service aides, she needed consistent guidance and redirection and appeared to be taking on the role of a playmate

6

rather than a parent. During visits in August 2020, mother had to be prompted to interact with the minor and had difficulty engaging with the minor, and she complained and blamed the therapist when it was brought to her attention at one of those visits. The Department noted it could only provide limited information regarding mother's visits with the minor every other week at Helping Hands, as mother declined to sign a release of information regarding services at that facility.

The minor had been in his current placement for over 16 months and was reportedly doing well with his caregivers, who provided physical therapy, speech therapy, and an infant program. The caregivers wanted to provide the minor with permanency through adoption. The minor struggled with separation from his caregivers when dropped off for visitation with mother. After visits he cried, screamed, scratched, and hit, was angry, and had nightmares. The report noted the minor was on track developmentally due to the services he received and the "consistent and stable support from the current caregivers." It was also noted that the minor's "disabilities are diminishing due to the current caregivers' engagement, support and consistent involvement."

The Department recommended the court terminate parental rights and free the minor for adoption.

*October 19, 2020 hearing on mother's section 388 petition*

On October 19, 2020, the court held a hearing to determine whether to grant or deny an evidentiary hearing on mother's section 388 petition. The Department stated its objection to an evidentiary hearing, arguing mother had not made the required prima facie showing. The Department argued that whatever progress mother had made in services did not constitute changed circumstances, nor did it demonstrate how reinstating services to mother would be in the minor's best interest. While mother had obtained a DVRO against father, the DVRO had been in place for only two and a half months, and was obtained only after mother's services were terminated. Given mother's "chronic

7

pattern of domestic violence" in her relationship with father, the relatively new DVRO was insufficient to demonstrate she had successfully addressed and resolved her issues with domestic violence. The Department also argued mother's completion of a parenting program nearly 19 months after being referred to those services was not evidence of changed circumstances, nor was the documentation showing mother attended the minor's speech and physical therapy sessions. It was also argued the therapist's report was specific to the minor's progress, not mother's progress.

The Department further argued there was insufficient evidence that returning the minor to mother would be in the minor's best interest, as mother was still having supervised visitation and was still in need of intensive services to address her own issues. The Department noted that the minor had been in foster care longer than he had been with mother, and the fact that the reunification period had expired "some time ago" rendered mother's request to resume reunification services inappropriate.

Mother's counsel argued the documentary evidence attached to her section 388 petition demonstrated changed circumstances. In particular, counsel argued the therapist's notes reflected "mother's self-recognition of her issues with domestic violence," her ability to recognize it, and her ability to take steps to protect herself and her children. Counsel further argued that mother had gained insight into the fact that her relationship with father was "toxic" and obtained a DVRO against father after her services were terminated. Mother also completed the services in her case plan. Counsel noted that mother had been diagnosed with autism, a disorder known to have certain characteristics including inability to make eye contact, inability to interact, and a significant amount of social anxiety. Mother was now able to interact independently with service providers, something she was unable to do prior to termination of her services, she participated in the minor's speech and physical therapy, and helped contribute to his success. Counsel further argued that mother was financially stable, was able to purchase

8

a car, and was consistent with visitation. Finally, mother's counsel argued there was no risk of danger to the minor if returned to mother's care.

Counsel for the minor indicated he had no objection to the setting of an evidentiary hearing on mother's petition. The court asked minor's counsel to identify what evidence supported mother's claim that the requested change was in the minor's best interest. Minor's counsel stated he could not "point to one thing that would say, yes, this convinces me this is in [the minor's] best interests over and above just a general understanding the child should be with a parent if they can." The court took the matter under submission.

*October 23, 2000 order denying mother's section 388 petition*

On October 23, 2020, the court issued a written order denying an evidentiary hearing on mother's section 388 petition. The court first noted that despite the minor being under the age of three at the time of detention in March 2019, the parents' reunification services were extended an additional six months in February 2020. Although the parents continued to make minimal progress as of the 12-month review hearing, the parties agreed to extend services another six months with the understanding that additional services would be added to their case plans based on the doctor's recommendations following mother's psychological evaluation and, if another incident of domestic violence occurred between the parents, services would be terminated without objection and the matter would be set for a section 366.26 hearing. On July 16, 2020, following the latest domestic violence incident, the parents' reunification services were terminated and a section 366.26 hearing was set pursuant to the parties' agreement.

Next, the court noted that mother continued to pursue services and "made some good progress." She had recently given birth to a baby boy and expressed her intention to continue to fully engage in services. The court also noted that the minor had been in his current relative placement, "a loving and stable placement," for nearly 17 months. He was securely attached to and bonded with his caretakers. During the approximately 16

9

months mother was receiving reunification services, she never progressed past supervised visits and she struggled to appropriately engage with the minor during the majority of that time. With regard to the best interest prong of section 388, the court stated mother's petition set forth "in conclusory terms" that it would be in the minor's best interest to return to her custody and/or reinstate her reunification services, but did not "point to any evidence to support why it would be in his best interests to remove him from the placement where he has thrived for the past almost 17 months." Similarly, minor's counsel was unable to identify any evidence to support mother's assertion.

The court found mother's circumstances were changing but not yet changed. The court also found that while mother undoubtedly loved the minor, the minor had not lived with mother for 19 months and her visits never progressed past supervised and had only recently begun improving in quality. Finally, the court found "[t]here has simply been no showing that it would be in [the minor's] best interests to grant the relief requested."

Mother filed a timely notice of appeal from the court's October 23, 2020 order.

*Minor's December 9, 2020 section 388 petition*

On December 9, 2020, counsel for the minor filed a section 388 petition seeking an order for visitation between the minor and his infant sibling, L.E. The court ordered a hearing to determine whether to grant or deny an evidentiary hearing on the minor's petition.

*December 17, 2020 section 366.26 hearing*

Both parents appeared for the contested section 366.26 hearing on December 17, 2020. Mother testified regarding her participation in services following termination of her services, including completion of a parenting program and visitation at Helping Hands. Mother also testified she participated in the minor's speech and motor skills therapy at Alta Regional Center once a month and took weekly early education classes with the minor. She played with the minor during visits and would take toys away from him when he misbehaved. She also changed the minor's diaper during visits when she

10

noticed he needed a diaper change. She denied ever being told by the minor or staff to change the minor's diaper. She admitted virtual visits with the minor during the COVID-19 pandemic were "a little more rough" due to the minor's age, and that she did become frustrated when she was redirected by a therapist.

Mother denied ever being unwilling to participate in reunification services and testified she completed her case plan services after her services were terminated by the court. She gave birth to the minor's sibling in October 2020, but had not had contact with father since July 2020. Mother testified that since July or August 2020, after her services were terminated, she took on a parental role during visits. She also testified she had a car, a home, and a savings account for the children.

Mother further testified she believed it was in the minor's best interest to be returned to her because she was his birth mother, she could provide anything he needed, she truly loved him, and she could now provide a more stable environment for him, free of domestic violence.

The social worker testified that according to the social service aide and the caregiver, the minor sometimes struggled with separating from his caregiver for visits with mother since July 2020. Since July 2020, mother had to be redirected to perform parental duties during supervised visits approximately four or five times. The social worker testified she credited the caregivers with the minor's progress and success in speech therapy because, although mother participated in the twice-monthly one-hour sessions, the caregivers participated in ongoing and continuous work with the minor during the remaining days and weeks between sessions and spent "24/7, seven days a week" with the minor helping him with his speech therapy, physical therapy, and other ongoing needs.

After commending mother on her progress in her case plan, the court noted that she had only recently started making progress after failing to do so during the first 18 months of the proceedings. The court found the minor was generally and specifically

11

adoptable. With regard to the beneficial parental relationship exception, the court found that although mother had established the first prong by demonstrating consistent visitation and contact with the minor, the exception did not apply because mother had not demonstrated a substantial emotional attachment to the minor or that the benefits of adoption were outweighed by the benefit of continuing her relationship with the minor. The court terminated parental rights and freed the minor for adoption. Based on the agreement of the parties, the court granted the minor's section 388 petition for continued contact between the minor and his infant sibling.

Mother filed a timely notice of appeal of the court's December 17, 2020 order terminating parental rights.

DISCUSSION

I

*Denial of Section 388 Petition*

Mother contends the juvenile court erred when it denied her section 388 petition without an evidentiary hearing. She claims her petition made a prima facie showing of changed circumstances and that the requested change was in the minor's best interest. The Department argues mother's circumstances were, at best, changing, and that the evidence in support of her petition was for the most part already known to the court, and the evidence meant to support the minor's best interests focused instead on mother's best interests and failed to demonstrate how the minor's best interests would be served by the requested change. As we will explain, mother's claim lacks merit.

A petition to change or modify a juvenile court order under section 388 must factually allege that there are changed circumstances or new evidence to justify the requested order, and that the requested order would serve the minor's best interests. (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 672.) The petitioner has the burden of proof on both points by a preponderance of the evidence. (Cal. Rules of Court, rule

12

5.570(h)(1)(D).)[2]  In assessing the petition, the court may consider the entire history of the case.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

To decide whether a parent has met his or her burden under section 388, the juvenile court must consider such factors as the seriousness of the problem that led to the dependency, and the reasons for the problem's continuation; the degree to which the problem may be and has been removed or ameliorated; and the strength of the relative bonds between the dependent child and the child's parents as well as the caretakers.  However, this list is not exhaustive.  (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1229.)

The child's best interests "are not to further delay permanency and stability in favor of rewarding" the parent for his or her "hard work and efforts to reunify."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

"A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests.  [Citation.]"  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, disapproved on other grounds in *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5 (*Caden C.*).)  The petition must be liberally construed in favor of its sufficiency.  (Rule 5.570(a).)  Nonetheless, if the juvenile court finds that, even so construed the petition fails to make a prima facie case as to either or both tests under section 388, the court may deny the petition without an evidentiary hearing.  (*In re Justice P., supra*, 123 Cal.App.4th at p. 189; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413-1414; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; see rule 5.570(d).)

We review the denial of a section 388 petition for abuse of discretion.  (*In re S.R.* (2009) 173 Cal.App.4th 864, 870; *In re J.T.* (2014) 228 Cal.App.4th 953, 965.)

---

[2]      Further rule references are to the California Rules of Court.

13

Here, mother's petition requested return of the minor to her care or, alternatively, reinstatement of her reunification services and unsupervised and overnight visitation. Mother argued changed circumstances based on the fact that she completed parenting education classes, made progress in her own therapy, participated in the minor's speech and physical therapy, obtained a DVRO against father and severed all ties with him, worked with her domestic violence therapist, purchased a car, established a support network, and attended all visits but for those canceled by the caregiver. She further argued the minor's best interests would be served by the requested change because he lived with mother for the first 10 months of his life, he knew her and referred to her as "mama," he sought mother out for comfort, he had a strong and loving bond with mother, he had a new baby brother, and mother had insight into what it was like to grow up with special needs. At the hearing to determine whether to conduct an evidentiary hearing on mother's petition, mother's counsel argued the points raised in the petition, namely, that mother had gained insight into the toxic nature of her relationship with father and learned how to protect herself and her children, as demonstrated by the DVRO she obtained, and the notes made by her therapist. Counsel further argued that mother's diagnosis of autism explained some of her behaviors (e.g., not making eye contact or interacting), which she was learning to overcome, and she had become financially stable and had been consistent with visitation.

The minor was removed in March 2019 due to the fact that mother and father had untreated mental health issues and were incapable of caring for the minor, as evidenced by the fact that the minor was not meeting his developmental milestones due to mother's failure to feed him, pick up on his cues for hunger, connect with him, care for him properly, or be consistent with medical appointments. Although mother was offered voluntary services on numerous occasions to assist her in meeting the minor's needs, she refused the help. Mother's engagement in services after the minor was removed and, during the first 18 months of the proceedings, was minimal, if not nonexistent, as noted

14

by the juvenile court. Additionally, the parents engaged in several domestic violence incidents which eventually led to termination of their reunification services in July 2020. Thereafter, and for the next three months until the October 2020 hearing, mother began to participate in services and, by all accounts, made some significant progress. While her progress is commendable, it demonstrates that, at best, her circumstances were changing.

Mother argues she has addressed the initial concerns of the Department and the domestic violence issues "significantly and completely," as evidenced by the fact that she ended her relationship with father and obtained a DVRO, and she made great progress in her individual therapy, which included domestic violence counseling. Again, while mother's progress regarding her domestic violence issues is laudable, that progress only began after services were terminated and was still considerably recent, given that the three most recent domestic violence incidents between the parents occurred on March 23, 2020, April 17, 2020, and July 7, 2020, and mother obtained the DVRO on July 29, 2020, less than three months prior to the hearing on her section 388 petition. In other words, her circumstances were still changing. A petitioner "must show changed, not changing, circumstances." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615, italics omitted.)

Mother's claim that return of the minor to her or reinstatement of her services was in the minor's best interest is similarly unavailing. In order to determine the minor's best interests, a court examines: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.) Mother claims she demonstrated the minor's best interests would be served by the requested change by arguing the minor lived with her for the first 10 months of his life, they shared a strong and loving bond, he called her "mama," and she knew firsthand what it was like to grow up with special needs. We are not persuaded.

While the minor spent the first 10 months of his life with mother, he spent the next nearly two-thirds of his young life in the home of relative caretakers, with whom he developed a strong, secure bond and in whose care he flourished. Indeed, he struggled with separation from his caregivers before visits with mother and cried, screamed, scratched, and hit, was angry, and had nightmares after visits.

Mother argues she was uniquely positioned to understand the minor's special needs because she herself grew up with her own special needs. However, those special needs were already being met by the relative caretakers, who were providing the minor with physical therapy, speech therapy, and an infant program, as well as life skills and socialization. While in mother's care, the minor was developmentally delayed due to her inability to adequately interact with him or otherwise meet his needs. With the "engagement, support and consistent involvement" of his caregivers, the minor was developmentally on track and his disabilities were diminishing. Mother provided insufficient evidence to demonstrate how removing the minor from his secure placement with his caregivers and returning him to her care or otherwise providing her with reunification services would be in his best interest.

We conclude the court did not abuse its discretion in denying mother's section 388 petition without an evidentiary hearing.

II

*Beneficial Parental Relationship Exception*

Mother contends the juvenile court erred when it found the beneficial parental relationship exception to adoption did not apply. The claim lacks merit.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re*

*Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Such circumstances include when the parents have maintained regular visitation and contact with the child, the child would benefit from continuing the relationship, and termination of parental rights would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *Caden C., supra*, 11 Cal.5th at p. 625.)

To prove that the beneficial parental relationship exception applies, the parent must show there is a significant, positive emotional attachment between the parent and child. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) The parent must also prove that the parental relationship " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re S.B.* (2008) 164 Cal.App.4th 289, 297, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) "In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H., supra*, at p. 575.) On the other hand, when the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Caden C., supra*, 11 Cal.5th at p. 634; *Autumn H.*, at p. 575.)

The beneficial parental relationship exception to adoption is an exception to the general rule that the court must choose adoption where possible, and it " 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) "The exception must be

17

examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*Autumn H., supra*, 27 Cal.App.4th at pp. 575-576.)

The party claiming the exception has the burden of establishing the existence of any circumstances which constitute an exception to termination of parental rights. (*In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1372-1373; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Rule 5.725(d)(2); Evid. Code, § 500.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C., supra*, 11 Cal.5th at pp. 639-640; *In re K.P.* (2012) 203 Cal.App.4th 614, 622-623.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Caden C.*, at p. 641.)

The specific elements of this statutory exception require a close examination of "the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Caden C., supra*, 11 Cal.5th at p. 626.) "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id.* at p. 634.) "[C]ourts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid.*)

Here, there was substantial evidence to support the court's finding that the beneficial parental relationship exception did not apply.

Mother claims the juvenile court found she had established consistent visitation and contact with the minor. We agree with the caveat that, as the record makes plain, it took her some time to become consistent with visits and, even when she did, she still had

18

difficulty engaging and interacting with the minor, she needed consistent guidance and redirection, and she reportedly appeared to be taking on the role of a playmate rather than a parent.

Even if there was sufficient evidence of consistent visitation and contact, the same cannot be said for mother's evidence that the minor had a significant, positive emotional attachment to mother such that the minor would benefit from continuing that relationship or be significantly harmed in the event the attachment were severed. As discussed above, the minor had spent approximately 19 months—over two-thirds of his young life—with his relative caregivers. He was bonded to and emotionally attached to his caregivers such that he struggled with separating from them prior to visits with mother and exhibited extreme behaviors after those visits. He looked to them for comfort and was flourishing in their care. Not only did the caregivers provide for the minor's daily needs but they also provided him with life skills and the services and support necessary to get on track developmentally. While mother argues at length that she had a bond with the minor which developed during her weekly visits with him and her participation in his classes and therapy, she did not provide evidence to demonstrate that losing the relationship with her would harm the minor "to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 634.)

The juvenile court did not err in finding the beneficial parental relationship exception to adoption did not apply.

## III

### *The ICWA*

Mother contends the juvenile court and the Department failed their continuing duty of the ICWA inquiry. She claims there was insufficient evidence to support the court's finding that the ICWA notices were proper and that the ICWA did not apply. The Department concedes the issue and agrees the matter must be reversed and remanded for further ICWA proceedings. We accept the Department's concession.

19

*Background*

The parents initially indicated they had no Indian ancestry, and the juvenile court found the ICWA does not apply. Thereafter, father reported he believed he had Blackfoot and Apache ancestry through his parents and his grandmothers, C.W. and D.C., but he was unsure of the specific band or where the tribes were located. The Department reported it was working with father to obtain information to complete the "Notice of Child Custody Proceeding for Indian Child," form ICWA-030.

On May 13, 2019, the Department sent notices of child custody proceedings for Indian child to the Bureau of Indian Affairs, the Secretary of the Interior, and 12 tribes (Blackfeet Tribe of Montana, Fort Sill Apache Tribe of Oklahoma, Yavapi-Apache Nation, San Carlos Tribal Council, White Mountain Apache, Jicarilla Apache Nation, Apache Tribes Oklahoma, Tonto Apache Tribal Council, Mescalero Apache Tribe, Cherokee Nation Oklahoma, United Keetoowah Band of Cherokee Indians Oklahoma, and Eastern Band of Cherokee Indians). The ICWA notices included information regarding mother, father, the paternal grandparents, and the paternal great-grandparents. The notices omitted father's birthplace[3] and relevant information about the paternal grandparents and paternal great-grandparents such as birthdates, birthplaces, tribal enrollment numbers, and general biological information.

Over the next several months, the Department received and filed responses from 11 of the 12 noticed Tribes (i.e., the Tonto Apache Tribe, the Mescalero Apache Tribe, the Blackfeet Tribe, the Eastern Band of Cherokee Indians, the Fort Sill—Chiricahua— Warm Spring Apache Tribe, the Yavapai-Apache Nation, the San Carlos Apache Tribe, the United Keetoowah Band of Cherokee Indians, the White Mountain Apache Tribe, the Cherokee Nation, and the Kiowa Tribe—Apache Tribe of Oklahoma), all of which

---

[3]     Father's birthplace was listed as California on the minor's birth certificate which was attached to the ICWA notices.

20

indicated the minor was neither enrolled nor eligible for enrollment therein. The Department requested that the court find that the ICWA does not apply.

On April 16, 2020, the court made a finding that the ICWA does not apply.

*Law and analysis*

"The juvenile court and social services agencies have an affirmative duty to inquire at the outset of the proceedings whether a child who is subject to the proceedings is, or may be, an Indian child. [Citation.]" (*In re K.M.* (2009) 172 Cal.App.4th 115, 118-119.) When the juvenile court knows or has reason to know that a child involved in a dependency proceeding is an Indian child, the ICWA requires that notice of the proceedings be given to any federally recognized Indian tribe of which the child might be a member or eligible for membership. (25 U.S.C. §§ 1903(8), 1912(a); *In re Robert A.* (2007) 147 Cal.App.4th 982, 989.) "At that point, the social worker is required, as soon as practicable, to interview the child's parents, extended family members, the Indian custodian, if any, and any other person who can reasonably be expected to have information concerning the child's membership status or eligibility." (*In re Michael V.* (2016) 3 Cal.App.5th 225, 233; see rule 5.481(a)(4)(A).)

ICWA notice must include, among other things, all of the following information, if known: the child's name, birthplace, and birth date; the name of the tribe in which the child is enrolled or may be eligible for membership; names and addresses (including former addresses) of the child's parents, grandparents, and great-grandparents, and other identifying information; and a copy of the dependency petition. (§ 224.3, subd. (a)(5)(A)-(H); *In re D.W.* (2011) 193 Cal.App.4th 413, 417; *In re Mary G.* (2007) 151 Cal.App.4th 184, 209.)

While the Department sent ICWA notices to 12 tribes that included information about father and his extended relatives, the notices omitted relevant information about the paternal grandparents and paternal great-grandparents. Further, there is no evidence the Department attempted to contact and obtain information from any of father's living

21

extended relatives. Section 224.2, subdivision (a) imposes "an affirmative and continuing duty to inquire" whether a child is or may be an Indian child. "It is essential to provide the Indian tribe with all available information about the child's ancestors, especially the one with the alleged Indian heritage. [Citation.] Notice to the tribe must include available information about the maternal and paternal grandparents and great-grandparents, including maiden, married and former names or aliases; birthdates; place of birth and death; current and former addresses; tribal enrollment numbers; and other identifying data." (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 703; accord, *In re Louis S.* (2004) 117 Cal.App.4th 622, 631 ["The Agency must provide all known information to the tribe, particularly that of the person with the alleged Indian heritage"]; *In re J.M.* (2012) 206 Cal.App.4th 375, 381.)

Here, as mother argues and the Department properly concedes, the ICWA notices failed to include known or readily ascertainable information about the paternal grandparents and paternal great-grandparents.

The Department's duty of the ICWA inquiry extends to the minor's extended family, if known. (§ 224.2, subd. (b); rule 5.481(a)(4).) Here, information regarding the minor's extended family was known. Whether the Department contacted the grandparents or great-grandparents or attempted to speak with them is unknown given the absence of any mention of such efforts in the record. That problem is compounded by the fact that the court never inquired about what efforts the Department made to obtain information from any of the minor's relatives. "[O]nce there is sufficient information to believe that the child[ ] might be [an] Indian child[ ] within the meaning of ICWA and the California statutes, 'responsibility for compliance' with those statutes 'falls squarely and affirmatively' on *both* the social services agency and the court. [Citation.] Accordingly, the court has a responsibility to ascertain that the agency has conducted an adequate investigation and cannot simply sign off on the notices as legally adequate without doing so." (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.) While the affirmative

22

and continuing duty of inquiry does not require the social services agency to conduct a comprehensive investigation into the minor's Indian status or to "cast about for Indian connections" (*In re C.Y.* (2012) 208 Cal.App.4th 34, 39, 42; *In re S.B.* (2005) 130 Cal.App.4th 1148, 1161), the agency must include in its reports a discussion of what efforts it undertook to locate and interview family members who might have pertinent information and, "[i]n the absence of an appellate record affirmatively showing the court's and the agency's efforts to comply with ICWA's inquiry and notice requirements, we will not, as a general rule, conclude that substantial evidence supports the court's finding that proper and adequate ICWA notices were given or that ICWA did not apply." (*In re N.G.* (2018) 27 Cal.App.5th 474, 484; accord, *In re K.R., supra*, 20 Cal.App.5th at p. 709.) Here, the Department failed its duty of inquiry. Therefore, the notices sent by the Department were insufficient for purposes of the ICWA.

"[E]rrors in an ICWA notice are subject to review under a harmless error analysis." (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1415.) If we conclude the juvenile court did not comply with the ICWA provisions, we "reverse only if the error is prejudicial." (*In re A.L.* (2015) 243 Cal.App.4th 628, 639.) Error is not presumed. It is mother's obligation to present a record that affirmatively demonstrates error. (*In re D.W., supra*, 193 Cal.App.4th at pp. 417-418.) Mother has done so here. The Department either did not take sufficient affirmative steps to investigate the minor's possible Indian ancestry or did not document its efforts to do so, and the juvenile court failed to ensure that an adequate investigation had been conducted. In the absence of evidence of the Department's efforts to fulfill its continuing duty of inquiry, we cannot say the failure of ICWA compliance was harmless. Therefore, we must remand for limited ICWA proceedings.

## DISPOSITION

The juvenile court's order terminating parental rights is conditionally reversed and the matter is remanded to the juvenile court for limited proceedings to determine

23

compliance under the ICWA. If, at the conclusion of those proceedings, no tribe indicates the minor is an Indian child within the meaning of the ICWA, then the juvenile court shall make the appropriate ICWA finding and reinstate the order terminating parental rights. If the juvenile court finds, after proper inquiry and notice, that the ICWA applies, the juvenile court shall hold such further proceedings as are appropriate. In all other respects, the orders of the juvenile court are affirmed.

    KRAUSE    , J.

We concur:

    HULL    , Acting P. J.

    RENNER    , J.